# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLIAM MARROW-EL | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil Action Case No. JFM-11-221 |
| | * | |
| CORRECTIONAL MEDICAL SERVICES, | * | |
| INC., et al. | * | |
| Defendants | * | |

## MEMORANDUM

William Marrow-El, a Maryland Division of Correction ("DOC") prisoner housed at the North Branch Correctional Institution in Cumberland, has filed a civil rights complaint under 42 U.S.C. § 1983 against Correctional Medical Services, Inc. ("CMS") and Physician's Assistant Moss.[1] Marrow-El, who is self-represented, seeks money damages and injunctive relief[2] and alleges he has been denied treatment for Hepatitis C Virus ("HCV") as well as treatment for back pain. ECF No. 1. Pending are a motion to dismiss or in the alternative for summary judgment

---

[1]   Plaintiff has also named several "John Doe" defendants. For the reasons that follow, even if plaintiff had named the proper parties, his complaint against them would be subject to dismissal.

[2]   Plaintiff's motion to amend (ECF No. 16) shall be granted.

Plaintiff's motions for preliminary injunction (ECF Nos. 9 & 18) wherein he asks the court direct he be transferred to a Veteran's Hospital, to a pre-release/halfway house, or home monitoring so he can receive further medical treatment at the Veteran's Hospital, shall be denied. A preliminary injunction temporarily affords an extraordinary remedy prior to trial than the relief that can be granted permanently after trial. The party seeking the preliminary injunction must demonstrate: (1) by a "clear showing" that he is likely to succeed on the merits at trial; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20-23 (2008); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292-93 (4th Cir. 2011). Plaintiff's request for injunctive relief shall be denied, as he does not clearly establish that he would suffer immediate and irreparable injury, loss, or damage if the requested relief is not granted.

Plaintiff's claims regarding treatment of any prostate and skin problems are not properly before the court. Plaintiff has raised concerns about the medical care provided to him for these issues for the first time in his motions for preliminary injunction. If plaintiff believes his constitutional rights have been violated in regard to the treatment rendered for these health concerns he is free to file a new civil rights complaint.

filed by counsel for defendants (ECF No. 11)[3] and plaintiff's oppositions thereto. ECF Nos. 17, 19 & 20. For the following reasons, the dispositive motion will be granted and relief denied.

Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

---

[3] The court declines to address defendants' argument that any injury arising prior to January 24, 2008, is time-barred. ECF No. 11. As the underlying constitutional claims are not established, the court also declines to exercise supplemental jurisdiction to address any state tort claims of negligence that may be raised in the complaint. Plaintiff's claim that defendants failed to timely notify him of his HCV positive status states, at best, a negligence claim.

2

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

A. Eighth Amendment Standard

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, plaintiff must demonstrate that the actions of defendants (or their failure to act) amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an

official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris* 240 F. 3d 383 (4th Cir. 2001), citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken). Further, "[d]isagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

Plaintiff has a history of hypertension, Hepatitis A Virus ("HAV") and HCV. Plaintiff complains that he was denied adequate treatment for infection with HCV.[4] He also complains that his pain was not adequately managed. ECF No. 1. There is no doubt that HCV is a serious medical condition that can lead to life-threatening consequences in a portion of those infected. From previous litigation in this district, the undersigned knows that HCV is a disease of the liver passed through infected blood or blood products (often during illegal intravenous drug use) that may become a chronic condition causing scarring of the liver. More than one-fourth of those infected will recover without problems, although minor scarring (fibrosis) may occur, or more damaging scarring, known as cirrhosis, may result. Some patients with cirrhosis develop liver failure or other complications. *See Worsham v. Governor,* Civil Action No. JFM-03-628 (D. Md.), Declaration of Sharon Baucom, M.D., ¶ 4, attached as ECF No. 19, Exhibit C in *Johnson v. Saar*, Civil Action No. PJM-07-343 (D. Md.).

---

[4] Hepatitis A Virus causes an acute illness that does not develop into a chronic form of liver infection and requires no treatment. *See* http://digestive.niddk.nih.gov/ddiseases/pubs/hepa_ez. No specific treatment is indicated for HAV. Over 85% of people with HAV recover within three months; nearly all patients recover within six months. ECF No. 11, Ex. A. Plaintiff received vaccinations against Hepatitis A and B on March 21 and April 21, 2006. ECF No. 11, Exhibit B, p. 1.

Medical records indicate that on January 9, 1997, blood tests revealed that plaintiff's alanine aminotransferase (ALT) level was 60 U/L, an elevated reading. The normal value of this enzyme is 4 to 43 u/L or less than 37 u/L, depending upon the laboratory conducting the test. As a result of the elevated level plaintiff was tested for Hepatitis: he tested positive for both HAV and HCV. ECF No. 11, Ex. A, Ex. B, p. 2-3.

Prior to July 1, 2004, there was no Department of Public Safety and Correctional Service ("DPSCS") policy regarding the treatment of HCV inmates. From July 1, 2004 to July 15, 2007, DPSCS policy listed certain criteria which, if met, excluded an inmate with HCV from receiving treatment. One of these criteria, was an ALT level less than two time the normal value for a period of six months to one year.[5] *Id.*, Ex. A.

From January, 1998 to April, 2007, plaintiff's ALT levels ranged from a low of 51 to a high of 72. Thus under the DPSCS policy in place, plaintiff did not qualify to receive HCV treatment. He was, however, enrolled in the HCV Chronic Care Clinic ("CCC") on May 19, 2005, so his condition could be monitored and evaluated on a regular basis. At that time he was

---

[5] CMS staff are contractually obligated to follow DPSCS policy when treating HCV positive inmates. ECF No. 11, Ex. A.

Plaintiff's complaint against CMS is based solely upon the doctrine of *respondeat superior,* which does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001), *citing Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984). Supervisory liability under § 1983 must be supported with evidence that (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994). Plaintiff has pointed to no action or inaction on the part of CMS that resulted in a constitutional injury, and accordingly, his claims against CMS shall be dismissed.

educated about his condition. *Id.*, Ex. A, Ex. B, p. 4-17. Plaintiff baldly claims that the delay in treating him for HCV caused him harm. ECF No. 19.

On July 15, 2007, the DPSCS policy regarding HVC was revised. Inmates were no longer required to maintain a certain ALT level before they would be considered for treatment. On September 21, 2007, plaintiff consented to HCV treatment. Plaintiff's case was presented via teleconference on September 25, 2007, to Patricia Barditch-Crovo, M.D. Dr. Barditch-Crovo recommended a liver biopsy to determine the stage of plaintiff's liver disease, prior to initiation of treatment. On November 21, 2007, the biopsy was performed. It showed chronic hepatitis with moderate inflammatory activity (Grade 3) and septal fibrosis (Stage 3). These results indicated plaintiff suffered from an intermediate degree of liver fibrosis for which treatment should be considered. Plaintiff was approved for HCV treatment on December 7, 2007. His treatment was delayed because his CT scan (done in conjunction with the liver biopsy) showed two low density lesions which required further evaluation. A repeat abdominal and pelvic CT scan taken on January 28, 2008, suggested the lesions were hemangiomas[6]—an abnormal buildup of blood vessels in the skin or an internal organ. An abdominal ultrasound on March 10, 2008, also showed the mass was consistent with hemangioma. ECF No. 11, Ex. A, Ex. B., p. 19-34.

Plaintiff complained of pain in the liver biopsy area on January 23, 2008. He was evaluated by Physician's Assistant Moss who prescribed Motrin (ibuprofen), a non-steroidal anti-inflammatory ("NSAID") medication, to alleviate pain. Moss also ordered x-rays of plaintiff's kidneys, ureters and bladder. The x-ray, taken on January 24, 2008, showed fecal retention and an anatomic variant in plaintiff's sacral spine. *Id.*, p. 30-31.

---

[6] A liver hemangioma is a noncancerous benign mass. *See* http://www.mayoclinic.com/health/liver-hemangioma/ds01125.

Plaintiff consulted with Gebreye Rufael, M.D. on April 17, 2008, concerning his HCV treatment. Dr. Rufael noted that the CT scan and sonograms demonstrated no evidence of chronic liver damage. Dr. Rufael recommended treatment with Pegasys and Ribavirin. Pegasys is a medication used alone or in combination with Ribavirin to treat chronic HCV in people who show signs of liver damage and who have not been treated with interferon alpha, medication similar to Pegasys, in the past. Ribavirin is an anti-viral medication that stops HCV from spreading throughout the body. Dr. Rufael explained the side effects of the medication, which include depression, infection, and thyroid dysfunction. Plaintiff asked whether he could begin the drug therapy at half the dose to gauge his reaction to the medication. Dr. Rufael advised plaintiff that the side effects were not dose dependent but recommended plaintiff take two-thirds of the dosage for the initial dose and then continue at the standard dose. Plaintiff began his treatment on April 30, 2008. His treatment was to continue until March 7, 2009. *Id*., p. 35-40.

While being treated for HCV plaintiff complained of pain, insomnia and irritability. Medical records show that plaintiff complained of generalized body aches after receiving his Pegasys injection on May 9, 2008. He did not request medication at that time. On June 6, 2008, plaintiff complained of hip pain, radiating down his thigh and shin. Motti Mulleta, M.D. prescribed a three month regimen of Nortriptyline, an anti-depressant also used to treat nerve pain. Plaintiff's complaints of pain in his left hip, thigh and shin continued. On July 11, 2008, Dr. Mulleta discontinued Notriptyline and prescribed Tegretol, an anti-seizure medication which is also effective in treating nerve pain. In September, 2008, plaintiff continued to complain of pain his left hip, now radiating to his foot. He also complained of pain in his shoulder. He stated that the pain worsened after his Pegasys injection. Ibuprofen was added to plaintiff's medication regimen. *Id*. p. 43-44, 47-49, 53-54, 57, 59-60.

Plaintiff complained to Dr. Mulleta on December 26, 2008, that the ibuprofen was not alleviating his pain. Dr. Mulleta discontinued the ibuprofen and prescribed Naprosyn, another NSAID, for pain relief. *Id.* p. 64-66.

From May 1 to December 26, 2008, plaintiff's ALT levels decreased from a high of 76 u/L to a low of 37 u/L. Plaintiff's HCV viral load also decreased to normal range, i.e. under 3,200 copies per mL. On January 16, 2009, seven weeks prior to the planned end of plaintiff's HCV treatment, he refused to continue treatment, claiming the medications were causing an increase in his blood pressure. Plaintiff also refused to follow a cardiac diet. Dr. Rufael noted, on January 22, 2009, that plaintiff refused post-treatment follow-up and counseling. *Id.* p. 41-42, 45-46, 51-52, 55-56, 58, 61-63, 67-73. Plaintiff states that he discontinued treatment due to his concerns that the treatment protocol was elevating his blood pressure. He further states that medical providers should have permitted him to take a half dose of the HCV medication. ECF No. 19.

On March 9, 2009, plaintiff was transferred to NBCI. *Id.*, p. 71. In June of 2009, plaintiff complained that the ache he developed in his right side during his HCV treatment had progressed and was now a "nagging constant pain." Physician's Assistant Lisa Schindler consulted with Colin Ottey, M.D. concerning plaintiff's care. As a result Imipramine/Tofranil, an anti-depressant proven to relieve neuropathic pain, was prescribed. On July 13, 2009, plaintiff requested he be prescribed Ultram—a narcotic like medication which is prescribed for moderate to severe pain and which can be habit forming. P.A. Schindler suggested plaintiff try Naprosyn first. In early August, 2009, plaintiff's prescription for Naprosyn was renewed and continued for three months. ECF No. 11, Ex. A, Ex. B. p. 76-84.

On February 7, 2010, plaintiff was evaluated by Dr. Ottey. Plaintiff was prescribed ibuprofen for his complaints of pain and x-rays of plaintiff's cervical spine, left shoulder and left arm were ordered to rule out a bone problem that might be the genesis of plaintiff's pain. The x-rays were taken on February 16, 2010. They showed no bony or joint abnormalities save for some degenerative changes of plaintiff's lower cervical spine. On that same date, plaintiff complained of a burning and throbbing pain in his jaw, neck, arm and hand. Plaintiff was evaluated by P.A. Schindler who discontinued plaintiff's ibuprofen and prescribed Neurontin, an anti-seizure medication also used to treat neuropathic pain. *Id.* p. 85-90.

On March 27, 2010, plaintiff was evaluated by Dr. Ottey. Plaintiff reported that he was not receiving pain relief under his medication regimen and his joints were stiff. Dr. Ottey prescribed Ultram for four months. *Id.*, p. 91-92.

On May 10, 2010, plaintiff's prescription for Neurontin was discontinued as it was noted that he frequently refused it. On July 18, 2010, plaintiff submitted a sick call slip stating his prescription for Ultram was due to expire on July 27, 2010 and seeking a renewal of the prescription. He was evaluated by P.A. Schindler on July 30, 2010. Plaintiff described his pain as "searing, throbbing, [and] deep." P.A. Schindler prescribed Elavil, another anti-depressant also used to treat neuropathic pain. *Id.*, p. 96-99, 102, 104.

Plaintiff was evaluated on August 19, 2010 by Majd Arnaout, M.D. Plaintiff complained that the Elavil made him drowsy. Dr. Arnaout discontinued the Elavil and prescribed Tylenol for pain. Plaintiff reported to P.A. Flurry, on September 12, 2010, that the Tylenol caused him to have rectal bleeding and asked that he be put back on Elavil. It was noted that plaintiff's test for rectal bleeding conducted on August 23, 2010, was negative, and plaintiff reported he had not seen blood in his stool for at least three days. Nonetheless, Flurry discontinued the Tylenol. On

October 13, 2010, plaintiff reported pain down his left side. Dr. Arnaout prescribed Indocin, another NSAID, to relieve plaintiff's pain. *Id.*, p. 106-113.

In November, 2010, plaintiff complained of pain and numbness on his left side and requested the Elavil be re-started. P.A. Schindler prescribed Elavil. On December 3, 2010, plaintiff sought and received an increase in the Elavil dosage. On January 28, 2011, plaintiff indicated he his pain was well controlled. *Id.*, p. 120, 123-24, 130-31.

On November 4, 2010, a teleconference was held between plaintiff and Dr. Rufael regarding plaintiff's HCV status. Dr. Rufael recommended plaintiff have a CT scan to follow up on the lesions identified in the 2007 CT scan. Dr. Rufael educated plaintiff about his condition and plaintiff was provided a copy of his August 20, 2010 viral load results, which remained undetectable. A CT scan was performed on December 10, 2010. It was recommended that the lesion in plaintiff's liver be further evaluated by MRI because the exact etiology of the lesion was not evident. On January 7, 2011, Dianna Harvey, LPN teleconferenced with Dr. Rufael regarding the CT results. Dr. Rufael requested Nurse Harvey review plaintiff's chart for past CT scans. A CT scan from April 2008 was sent to Dr. Rufael for comparison. The scans showed that the lesion remained unchanged. *Id.*, p. 116-17, 121-22, 125-31.

From April 27, 2010, to the filing of defendants' dispositive motion, plaintiff's ALT levels have been in the normal range and his HCV viral load has been non-detectable. *Id.*, p. 93, 103, 105, 114-15, 118-19, 140-42.

"Disagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). Based on defendants' representations, the court finds that plaintiff's health care needs have been met to date and his health status has been monitored. The court

further finds that plaintiff's refusal to follow prescribed treatment plans led to the lack of completion of his HCV treatment as well as delays in the management of his pain. Nonetheless, the record evidence demonstrates that plaintiff received antiviral therapy to treat his HCV and his condition has been frequently monitored by medical staff as to both his HCV status and his complaints of pain. A variety of pain medications have been prescribed to plaintiff in an effort to manage his pain. Nothing more than what has been provided to plaintiff is constitutionally required. Accordingly, defendants' dispositive motions shall be granted and this case closed by way of a separate Order.


<u>November 16, 2011</u>                                   ___/s/_____
(Date)                                                    J. Frederick Motz
                                                          United States District Judge